ACCEPTED
06-15-00113-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
12/21/2015 3:35:03 PM
DEBBIE AUTREY
CLERK

NO. 06-15-00113-CR

IN THE COURT OF APPEALS
FOR THE SIXTH APPELLATE DISTRICT
AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
12/21/2015 3:35:03 PM
DEBBIE AUTREY
Clerk

CASEY AUSTIN JONES

VS.

THE STATE OF TEXAS

APPEALED FROM THE 71ST DISTRICT COURT, HARRISON COUNTY
TRIAL CAUSE NO. 12,0154X

**BRIEF FOR CASEY AUSTIN JONES, APPELLANT**

Hough-Lewis ("Lew") Dunn
Attorney at Law
201 E. Methvin, Suite 102
P.O. Box 2226
Longview, TX 75606
Tel. 903-757-6711
Fax 903-757-6712
Email: dunn@texramp.net

***Appellant Respectfully Requests Oral Argument***

## STATEMENT REGARDING PARTIES TO THIS APPEAL
### [RULE 38.1(a) TEX.R.APP. PROC.]

CASEY AUSTIN JONES
Appellant

Stephen Smith
Attorney at Law
Texas State Bar #18684700
501 Spur 63, Suite C-6
Longview, TX 75601
Trial Counsel for Appellant

Jon Hyatt
Attorney at Law
Texas State Bar #24072161
P.O. Box 7935
Longview, TX 75607
Counsel for Appellant in Habeas Corpus Proceeding

Coke Solomon, Criminal District Attorney
Texas State Bar #24041954
Patricia Colleen Clark, Assistant Criminal District Attorney
Texas State Bar #04293800
Kristin M. Kaye, Assistant Criminal District Attorney
Texas State Bar #24068106
P.O. Box 776
Marshall, TX 75671
Counsel for the State at Pre-Trial and Trial

Laura M. Carpenter, Assistant Criminal District Attorney
Texas State Bar #08618050
P.O. Box 776
Marshall, TX 75671
Counsel for State on Appeal

## STATEMENT REGARDING PARTIES TO THIS APPEAL
## (CONTINUED)

Hough-Lewis ("Lew") Dunn
Attorney at Law
P.O. Box 2226
Longview, TX 75606
Counsel for Appellant on Appeal
Texas State Bar No. 06244600

# TABLE OF CONTENTS

PAGE

STATEMENT REGARDING PARTIES TO THIS APPEAL ….. ii

TABLE OF CONTENTS …………………………………… iv

TABLE OF AUTHORITIES ………………………………. vii

STATEMENT OF THE CASE …………………………… xiii

ISSUES PRESENTED ……………………………………. xiv

STATEMENT OF FACTS ……………………………….. 2

      THE GUILTY PLEA …………………………………. 2

      PUNISHMENT HEARING ………………………….. 2

      HEARING ON MOTION FOR NEW TRIAL …………. 9

SUMMARY OF THE ARGUMENT ……………………… 10

FIRST ISSUE, RESTATED …………………………… 10

THE EVIDENCE WAS LEGALLY INSUFFICIENT ………… 10

SECOND ISSUE, RESTATED ………………………… 10

THE EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE
 THE ALLEGATIONS IN THE INDICTMENT AS AMENDED

THIRD ISSUE, RESTATED …………………………… 10

SINCE THE EVIDENCE IS LEGALLY INSUFFICIENT, THERE
 EXISTS A DOUBLE JEOPARDY VIOLATION UNDER
*BLOCKBERGER*

                                                                                                                      **PAGE**

FACTS ……………………………………………………… 11

THE LAW …………………………………………….. 12

ANALYSIS ……………………………………………… 14

FOURTH ISSUE, RESTATED …………………………………… 17

THE JUDGMENT IS VOID BECAUSE APPELLANT WAS NOT GIVEN CREDIT FOR TIME SPENT UNDER HOUSE ARREST

FIFTH ISSUE, RESTATED ……………………………………. 17

THE JUDGMENT IS DEFECTIVE AND SHOULD BE REFORMED TO GIVE  APPELLANT CREDIT FOR TIME SPENT UNDER HOUSE ARREST

SIXTH ISSUE, RESTATED …………………………………….. 17

THE TRIAL COURT REVERSIBLY ERRED WHEN IT DID NOT GIVE APPELLANT CREDIT ON HIS SENTENCE FOR TIME HE SPENT UNDER HOUSE ARREST, WHICH WAS THE EQUIVALENT UNDER ART. 42.035, TEX. CODE CRIM. PROC., TO TIME SPENT INCARCERATED

FACTS ………………………………………………….. 17

LAW AND ANALYSIS……………………………………. 19

SEVENTH ISSUE, RESTATED …………………………………. 27

THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO SUPPRESS APPELLANT'S STATEMENT

FACTS …………………………………………………… 27

|  |  | PAGE |
|---|---|---|
| <u>LAW</u> ……………………………………………….. | | 33 |
| FRAUD AND RELATED CONCEPTS ………….. | | 35 |
| <u>ANALYSIS</u> ………………………………………. | | 37 |
| <u>HARM ANALYSIS</u> …………………………………. | | 40 |
| PRAYER FOR RELIEF ………………………………….. | | 41 |
| CERTIFICATE OF SERVICE ……………………………… | | 42 |
| CERTIFICATE OF COMPLIANCE …………………………… | | 42 |

# TABLE OF AUTHORITIES

CASES                                                                    PAGE

*Bigon v. State*, 252 S.W.3d 360 (Tex. Crim. App. 2008) ……………  16

*Blockberger v. United States*, 284 U.S. 299 (1932) …………………  16

*Brooks v. State*, 323  S.W.3d 893 (Tex. Crim. App. 2010) ………….  15

*City of Dallas v. Half Price Books, Records, Magazines, Inc.*, …….  34-35
    883 S.W.2d 374 (Tex. App. – Dallas 1994, no writ)

*Dedo v. State*, 680 A.2d 464 (Md. Ct. App. 1996) …………………  23, 24

*DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670 (Tex. 1990) ……..  40

*Ex parte Brister*, 801 S.W.2d 833 (Tex. 1990) …………………..  20

*Ex parte Patterson*, 740 S.W.2d 766 (Tex. Crim. App. 1987)  ……  20
    overruled on other grounds, *Ex parte Beck*, 769 S.W.2d 525
    (Tex. Crim. App. 1989)

*Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788 (Tex. 2006) ………….  35

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*,  40
    960 S.W.2d 41(Tex. 1998).

*Frazier v. Cupp*, 394 U.S. 731 (1969) ………………………………  38

*Gonzales v. State,* 67 S.W.3d 910 (Tex. Crim. App. 2002) ………….  34

*Grant v. State*, 659 P.2d 878 (Nev. 1983) …………………………….  23

*Grant Thornton LLP v. Prospect High Income Fund*, ………………  40
    314 S.W.3d 913 (Tex. 2010).

*Holmes v. State*, 323 S.W.3d 163 (Tex. Crim. App. 2010) ………….  41

                                                                              PAGE

*In re FirstMerit Bank, N.A.,* 52 S.W.3d 749 (Tex. 2001) ………….. 41

*In re McPhee*, 442 A.2d 1285 (Vt. 1982) ………………………….. 23

*In re Winship*, 397 U.S. 358 (1970) ……………………………….. 14

*Jackson v. Virginia*, 443 U.S. 307 (1979) ………………………… 14

*Lynumn v. Illinois*, 372 U.S. 528 (1963) ……………………… 38, 39, 40

*Moran v. Burdine*, 475 U.S. 412 (1986) ………………………….. 38

*Nygren v. State*, 658 P.2d 141 (Alaska Ct. App. 1983) …………….. 23

*Pierce v. State*, 32 S.W.3d 247 (Tex. Crim. App. 2000) ………….. 39

*Pham v. State*, 175 S.W.3d 767 (Tex. Crim. App. 2005) ………….. 33

*Puente v. State*, 320 S.W.3d 352 (Tex. Crim, App. 2010) …………. 14

*State v. Fellhauer*, 943 P.2d 123 (Ct. App.), ……………………… 23
       *cert. denied*, 942 P.2d 189 (1997).

*State v. Kelekolio*, 849 P.2d 58 (Hawaii 1993) …………………… 39

*State v. Kelly*, 204 S.W.3d 808 (Tex. Crim. App. 2006) ………….. 33

*State v. Reyes*, 504 A.2d 43 (N.J. Super. Ct. App. Div.) …………. 23
       *cert. denied*, 511 A.2d 671 (1986);

*State v. Robinson*, 334 S.W.3d 776 (Tex. Crim. App. 2011) ……… 33

*Studer v. State*, 799 S.W.2d 263 (Tex. Crim. App. 1990) ………… 16

*Tagorda v. State*, 977 S.W.2d 632 ………………………………… 21, 22
      (Tex. App. – Fort Worth 1998, no pet.)

PAGE

CASE

*Taylor Elec. Servs., Inc. v. Armstrong Elec. Supply Co.,* ………. 40
167 S.W.3d 522, (Tex. App.-Fort Worth 2005, no pet.)

*Webb v. State,* 278 S.W.2d 158 (Tex. Crim.App. 1955) …………... 15

W*ilson v. State*, 536 S.W.2d 375  (Tex.Crim.App. 1976) …………. 14

*Wilson v. State*, 311 S.W.3d 452 (Tex. Crim. App. 2010) ……….. 39

*Yellowbear v. State*, 874 P.2d 241 (Wyo. 1994) ……………………. 23

STATUTES AND RULES

U.S. CONST.

Fifth Amendment ……………………………………… 12, 27, 40

Sixth Amendment …………………………………….. 13, 16, 27

Fourteenth Amendment …………… 13, 14, 15, 20, 27, 38, 39, 40

TEX. CONST.

Art. 1, §10 ……………………………………………….. 13, 27

Art. 1, §14 ……………………………………………….. 13,16

Art. 1, §19 ……………………………………………….. 13, 14

Art. 5, §12 ……………………………………………….. 16

Art. 16, §1(a) …………………………………………….. 34, 38

TEX. BUS. & COMM. CODE

    Chapter 17 ……………………………………………. 36

    §17.01 ……………………………………………. 36

    Chapter 27 ……………………………………………. 36

    §27.01 ……………………………………………. 37

    §27.02 ……………………………………………. 37

TEX CODE CRIM. PROC.

    Art. 1.04 ……………………………………………….. 13, 14

    Art. 1.05 ……………………………………………….. 13

    Art. 1.10 ……………………………………………….. 13

    Art. 1.14(b) ……………………………………………….. 16

    Art. 2.12 ……………………………………………….. 34

    Art. 2.13 ……………………………………………. 34

    Art. 2.13(a) …………………………………………… 34

    Art. 11.21 ……………………………………………. 20

    Art. 11.22 …………………………………………….. 20

    Art. 28.10 …………………………………………… 12

    Art. 28.10(a) …………………………………………… 12, 13

    Art. 28.11 …………………………………………… 12

PAGE

TEX CODE CRIM. PROC.

 Art. 38.21 ……………………………………………… 27

 Art. 38.22 ……………………………………………… 27

 Art. 38.23 ……………………………………… 27, 33, 34, 39

 Art. 42.03 Sec. 2(a) …………………………………….. 21, 25

 Art. 42.035 ……………………………………… 19, 21, 24, 25

TEX. PENAL CODE

 Chapter 32 ……………………………………………… 36

 §32.42 ………………………………………………….. 36

 §32.42 (a)(2) ………………………………………….. 36

 §32.42 (b) (12)(B)…………………………………….. 36, 40

TEX. R. APP. PROC.

 Rule 44.2(a) …………………………………………… 40

OTHER

B. FEUCHTER, "CRIMINAL LAW – Home Alone: Why House .. 22, 23
Arrest Doesn't Qualify for Presentence Confinement Credit in
New Mexico – *State v. Fellhauer,*" 28 NEW MEXICO LAW REV. 519
(Summer 1998).

"Euclid's Elements, Book I, Common Notions" at ………………. 24
 aleph0.clark.edu/~djoyce/elements/bookl/cn.html

OTHER

RESTATEMENT OF CONTRACTS (SECOND) …………………….     35, 37, 39-40

      § 159 …………………………………………..     35

      § 162 …………………………………………..     35

      § 164 ………………………………………….     35

      § 167 …………………………………………     36

All statutory and rule citations are to the current version found in Vernon's Annotated Codes and Statutes.

**STATEMENT OF THE CASE**

Appellant was charged with three counts of sexual assault of a minor (under age 17), with the additional allegation that each such offense was with a person whom he was prohibited from marrying or purporting to marry or with whom he was prohibited from living under the appearance of being married. However, the indictment was subsequently amended to delete the latter allegations. Appellant waived a jury trial and pleaded guilty to the trial court. After hearing evidence on punishment, the trial court assessed a sentence of three (3) years confinement in the Texas Department of Criminal Justice, Institutional Division, for each count, to run concurrently. A motion for new trial was subsequently heard and denied, and the cause is now before this Honorable Court.

**ISSUES PRESENTED**

FIRST ISSUE: THE EVIDENCE WAS LEGALLY INSUFFICIENT

SECOND ISSUE: THE EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE THE ALLEGATIONS IN THE INDICTMENT AS AMENDED

THIRD ISSUE: SINCE THE EVIDENCE IS LEGALLY INSUFFICIENT, THERE EXISTS A DOUBLE JEOPARDY VIOLATION UNDER *BLOCKBERGER*

FOURTH ISSUE: THE JUDGMENT IS VOID BECAUSE APPELLANT WAS NOT GIVEN CREDIT FOR TIME SPENT UNDER HOUSE ARREST

FIFTH ISSUE: THE JUDGMENT IS DEFECTIVE AND SHOULD BE REFORMED TO GIVE APPELLANT CREDIT FOR TIME SPENT UNDER HOUSE ARREST

SIXTH ISSUE: THE TRIAL COURT REVERSIBLY ERRED WHEN IT DID NOT GIVE APPELLANT CREDIT ON HIS SENTENCE FOR TIME HE SPENT UNDER HOUSE ARREST, WHICH WAS THE EQUIVALENT UNDER ART. 42.035, TEX. CODE CRIM. PROC., TO TIME SPENT INCARCERATED

SEVENTH ISSUE: THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO SUPPRESS APPELLANT'S STATEMENT

NO. 06-15-00113-CR

IN THE COURT OF APPEALS
FOR THE SIXTH APPELLATE DISTRICT
AT TEXARKANA

CASEY AUSTIN JONES

VS.

THE STATE OF TEXAS

APPEALED FROM THE 71ST DISTRICT COURT, HARRISON COUNTY
TRIAL CAUSE NO. 12-0154X

**BRIEF FOR CASEY AUSTIN JONES, APPELLANT**

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

COMES NOW CASEY AUSTIN JONES, Appellant, on appeal in Cause No. 12-0154X, and the "Judgment of Conviction" of the District Court for the 71st Judicial District of Harrison County, Texas, wherein he was found guilty of three (3) counts of the offense of sexual assault of a child under 17, a second degree felony, and sentenced by the Honorable Brad Morin, to three (3) years on each count in the Texas Department of Criminal Justice, Institutional Division, to run concurrently, in which Appellant was Defendant, and in which the State of Texas was plaintiff and is now Appellee.

1

**STATEMENT OF FACTS**

THE GUILTY PLEA

On June 12, 2015, Appellant waived a jury trial and entered a plea of "guilty" to the indictment (5 RR 12) as amended, executing several documents as a part of his plea, following which the trial court accepted the guilty plea. After a recess of several days, the trial court reconvened on June 18, 2015, to hear evidence at the punishment phase (6 RR).

PUNISHMENT HEARING

On June 18 the State put on evidence from the following witnesses on punishment: Detective Cindy Black (6 RR 6), M____ F_____ (6 RR 64), and Dana Belony (6 RR 126). Appellant elicited evidence from Anna Dowden and DeAlisa Dean (6 RR 149 and 161).

Through Det. Black the State introduced a video of Appellant's statement, State's Exhibit # 1 (6 RR 8).

On cross-examination it was brought out that MF, at age 16 and one-half, was reluctant to come forward in the investigation or to prosecute Appellant (6 RR 21), that she a willing participant in the sexual acts with Appellant (6 RR 11), to the point of getting into bed with him and his wife (6 RR 26-27), and that she continued (even while Appellant was on pre-trial

release and while he and his wife Heather[1] were both prohibited from contacting her) to approach Appellant and his wife (6 RR 29-32). Appellant put into evidence the "phone dump" from MF's phone, showing the entire contents of same (6 RR 37 ff). Det. Black agreed that Appellant had no criminal history (6 RR 50).

MF was the State's next witness (6 RR 63). At the time of trial she was 20 years old; date of birth: June 8, 1995. She identified Appellant as her "half-uncle" because he was her father's half-brother; she had known him all her life (6 RR 63-64). In December 2011 MF was in habit of occasionally sleeping at Appellant's house on the couch (6 RR 65). However, Appellant had a roommate, Wade, staying there and suggested that MF stay in the same bed in the bedroom where he and his wife slept. For a few nights nothing happened, but one morning she awoke and found Appellant fondling her (6 RR 67-68). Eventually the touching led to sex between the two with the wife, Heather, present (6 RR 70). That led to conversations about the three (Appellant, his wife and MF) living in a polygamous sort of arrangement (6 RR 71). The sexual activity between them continued into 2012, when it was discovered by her parents (6 RR 75 ff). The State then offered State's Ex. # 2, a cellphone video of Appellant masturbating, which

---

[1] Arising out of these events, Heather Jones was indicted for an offense of sexual

he sent to MF in exchange for videos and photos of her (6 RR 81). Among other reasons for having sex with Appellant, MF testified that "it was nice to have that attention" (6 RR 83). On cross-examination MF also stated that the relationship she had with Appellant "was satisfactory" to each of them, but, in retrospect "very unwise" (6 RR 91). MF testified that when her mother discovered this in early 2012, MF did not want her to tell the police or for anything bad to happen to Appellant and his wife (6 RR 104). Mf stated that she did not think Appellant posed a risk of harm to her in any way (6 RR 105). She considered her life at the time of trial to be fairly normal and pleasant with no emotional problems or issues (6 RR 107).

Next, Dana Belony, MF's mother, testified for the State (6 RR 125). She found the cellphone messages on MF's phone in February 2012 (6 RR 127). However, she did not call the police at that time; MF did not reveal the true extent of the sexual activities she and Appellant had engaged in; MF begged Ms. Belony not to report the incidents (6 RR 131). However, in March Ms. Belony accessed MF's phone and saw a video that was "very explicit" (6 RR 132). Thereafter, that same evening the witness decided that matters would come out; she received a call from Appellant and told him he "was going to jail" (6 RR 134-135). The witness opined that a five year

sentence would not be enough. "I would throw him under the bus if it was me" (6 RR 147).

With that, the State rested its case-in-chief on punishment (6 RR 148).

Appellant called Anna Dowden (6 RR 148). She stated that she knew both Appellant and his wife, Heather (6 RR 150).Ms. Dowden testified about an incident at a job fair which she and Heather attended together. At a store called "Game Stop" Heather was concerned about violating a restraining order, since MF was also present (6 RR 153-54). MF had initiated a conversation with Heather, and Heather was trying to avoid MF (6 RR 154).

Next, DeAlisa Dean testified that Appellant was her son-in-law (6 RR 160). Heather and Appellant had been married 10 years; Ms. Dean thought he was "a wonderful guy" (6 RR 162). She testified that she did not think Appellant presented a risk of harm to children (6 RR 164). She did not think society would benefit from Appellant being sent to prison (6 RR 166). However, she did think that probation would be a better alternative (*id.)*.

The court recessed after that testimony, setting the following Monday as a further date for testimony (6 RR 173).

On June 22, 2015, the hearing on punishment resumed (7 RR). At the start, the trial court renumbered the State's exhibits, so that what were

formerly State's 1 and 2, became now State's 6 and 7 (7 RR 7). Counsel for Appellant then offered into evidence (received without objection) Defense Exhibit # 2, a letter from Darren Williams, the probation officer who had supervised Appellant's pre-trial activities (7 RR 6-7).

Alicia Ratcliff next testified on behalf of Appellant (7 RR 8). She was an officer at a local bank; Appellant was her nephew (7 RR 9). She understood the nature of the charges and that the trial court was considering the appropriate punishment in the case (7 RR 10). She related a brief history of Appellant's accomplishments and recommended probation for him (7 RR 12-13).

Donna Salee then testified, a retired RN (7 RR 30). Her children had gone to school with Appellant; that is how she knew him; he helped do fund-raisers at the Elks Lodge (7 RR 33). Ms. Salee stated that Appellant did not pose a risk of harm to the community (7 RR 34) or hurt children (7 RR 35).

Next to testify for Appellant was Roger Jones, a pipe welder for Kellogg Brown and Root (7 RR 45-46). He was Appellant's father (7 RR 46). He spoke well of his son (7 RR 47-48). He did not think Appellant posed a risk to any child or a threat to anybody (7 RR 56-57). He could not think of any reason for sending Appellant to prison (7 RR 59). He witnessed

Jeff (MF's step-father) beat up Appellant when Jeff found out from MF about her conduct with Appellant (7 RR 61).

Then Stephanie Wells testified, an instructor in information technology at TSTC (7 RR 65-66). Appellant was one of her students there (7 RR 66). She described Appellant as a "model student" and very diligent in his college work (7 RR 68). Appellant also helped set up gaming club (an "IT club") there with about 20 to 30 students (7 RR 68-69). After the incident with MF, Appellant's work declined and he became "withdrawn and stressed" (7 RR 70). The witness did not think Appellant would be any risk or harm to children (7 RR 73).

Next testifying for Appellant was Jason King, an "At Home Health Care" technician (7 RR 79-80). At one point in his life he had been a corrections officer at the George Beto Unit of TDCJ in Palestine and Tennessee Colony (7 RR 81). He knew Appellant and is wife and also knew MF (7 RR 82). He characterized Appellant as not being violent, that he got along generally well with people (7 RR 87).He did not think that Appellant presented any real threat to society or to other females or children (7 RR 90-91). He favored a "deferred sentence monitored by the community" rather than imprisonment (7 RR 92).

Ben Harbor then testified, second cousin of Appellant (7 RR 102-03). He stated that he would not have a problem giving Appellant employment (7 RR 104). He did not see Appellant as a threat to the community (7 RR 106).

Then Jesse Parson testified that he knew Appellant from attending classes with him at TSTC (7 RR 113). He described Appellant: "Loyal, honest, trustworthy…hard-working"; he did not believe that he presented any kind of risk or danger to the community (7 RR 115, 116-17).

Finally, Appellant testified (7 RR 120). He admitted having sex with MF, though the dates for those offenses had been changed by the State (7 RR 130). He stated that he took full responsibility for it and did not blame MF at all (7 RR 131). He testified that, contrary to what some witnesses might have said, there were no further sexual encounters after he was beaten up and events were made know to MF's parents (7 RR 132). Appellant denied any attraction to children or minors (7 RR 137). He asked the trial court to consider placing him on community supervision and gave his reasons for that (7 RR 137). Appellant stated that, although he had initially stated (at the hearing on the Motion to Suppress – see Volume 3, RR) that his confession was a lie, he now stated that "for the most part, my confession was true…" (7 RR 152).

Thereafter, evidence was closed and the parties proceeded to argument (7 RR 155). Trial Counsel for Appellant argued for a deferred disposition and community supervision (7 RR 160). State's Counsel argued for seven years imprisonment (7 RR 162). The trial court then recessed the proceedings to a later date for pronouncement of sentence (7 RR 163).

On June 24, 2015, the trial court made a formal finding of guilt to the allegations (8 RR 4), stated that he could not "in good conscience give [him] a deferred adjudication," and therefore assessed a sentence of three (3) years in TDCJ (8 RR 5). He continued: "The Court will give you credit for any time served that you have toward these offenses." Then he said: "The victim's mother had requested five years. I gave you two years' credit for not requiring the child to go through a jury trial in this matter, as well as the fact that you finally accepted responsibility in this" (8 RR 6-7).

HEARING ON MOTION FOR NEW TRIAL

On August 10, 2015, Appellant argued his Motion for New Trial (CR 172 ff) and put on his evidence in support thereof (Supp. RR). The Motion for New Trial was overruled (CR 188).

## SUMMARY OF THE ARGUMENT

THE EVIDENCE IS LEGALLY INSUFFICIENT TO CONVICT: THERE IS A FATAL VARIANCE BETWEEN PLEADINGS AND PROOF OF THE YEAR OR YEARS OF THE OFFENSE; THAT FATAL VARIANCE ALSO IMPLICATES DOUBLE JEOPARDY UNDER A *BLOCKBERGER* ANALYSIS. THE JUDGMENT IS VOID AND/OR DEFECTIVE SINCE THE TRIAL COURT DID NOT GIVE APPELLANT CREDIT FOR TIME HE SPENT UNDER HOUSE ARREST FOR OVER 300 DAYS WHILE AWAITING TRIAL; TEXAS LAW SPECIFICALLY ALLOWS CREDIT FOR JAIL TIME IF SOMEONE IS PLACED UNDER HOUSE ARREST AND ALSO APPLIES TIME IN JAIL TOWARD A SENTENCE.   SINCE THE STATE, TO INDUCE APPELLANT'S CONFESSION, VIOLATED LAWS PROHIBITING FRAUD, APPELLANT'S STATEMENT SHOULD HAVE BEEN SUPPRESSED.

## FIRST ISSUE, RESTATED

THE EVIDENCE WAS LEGALLY INSUFFICIENT

## SECOND ISSUE, RESTATED

THE EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE THE ALLEGATIONS IN THE INDICTMENT AS AMENDED

## THIRD ISSUE, RESTATED

SINCE THE EVIDENCE IS LEGALLY INSUFFICIENT, THERE EXISTS A DOUBLE JEOPARDY VIOLATION UNDER *BLOCKBERGER*

In the interests of judicial economy, these issues are grouped together, since they have a common nexus of fact and law.

FACTS

At a hearing on May 26, 2015, on motion by the State (CR 70-71), the trial court amended the indictment from its original version (CR 8-9) to its altered version (CR 68-69). There was an attempt to amend all four paragraphs of the indictment, each of which contain strike-throughs and, in two of the three, interlineations. The record reflects the trial court's making the amendments in a sort of dialogue with State's counsel (4 RR 9-10).

However, the amendments were imperfect and not carried through in two instances, as follows:

In the first paragraph the original indictment read: "…on or about the 22nd day of DECEMBER, 2011, …" However, beneath that is the hand-written notation "21st day January 2012", with the trial court's initials "BM." What is lacking is a strike through of the original date: 22nd day of December, 2011."

In the third paragraph (Count II) the original indictment read: "…28th day of DECEMBER, 2011…" Above that is hand-written: "February 2012." The word "DECEMBER" is stricken through, but not the year "2011."

Consequently, the indictment is left with two allegations as to Count I: both 22nd day of December 2011 and 21st day of January 2012. There are

also two allegation in Count II: 28th February 2012 and 28th day February 2011.

The allegation in Count III is identical to the "amended" allegation in Count I. In other words, two counts allege the identical offense. There is nothing different between them.

In his plea Appellant entered a judicial confession that tracked the supposedly "amended" indictment (CR 147). See also the colloquy between the trial court and Appellant (5 RR 6-7) and the finding of guilt by the trial court (8 RR 4-5). However, Appellant contends that such a plea and judicial confession are legally insufficient to prove the allegations in the indictment.

THE LAW

The law of indictments in such matters is found in Articles 28.10 and 28.11, TEX. CODE CRIM. PROC. Important in such discussions are these Federal and State Constitutional considerations:

U.S. CONSTITUTION

Fifth Amendment: "No person shall be held to answer for a capital or infamous crime unless upon presentment or indictment of a grand jury… nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb…"

Sixth Amendment: "In all criminal prosecutions, the accused shall enjoy the right…to be informed of the nature and cause of the accusation…"

Additionally, there are rights of due process of law and equal protection of the law secured under the Fourteenth Amendment.

TEXAS CONSTITUTION

Art. 1, §10. "RIGHTS OF ACCUSED IN CRIMINAL PROSECUTIONS. In all criminal prosecutions the accused shall have … the right to demand the nature and cause of the accusation against him, and to have a copy thereof… and no person shall be held to answer for a criminal offense, unless on an indictment of a grand jury …"

Art. 1, §14. "DOUBLE JEOPARDY. No person, for the same offense, shall be twice put in jeopardy of life or liberty…"

Additionally, there are rights of "due course of the law" under Art. 1, §19, TEX. CONST.

*See also*, Art. 1.04, (due course of the law), Art. 1.05 (rights of the accused), and Art. 1.10, (double jeopardy). TEX. CODE CRIM. PROC.

Art. 28.10(a), TEX. CODE CRIM. PROC., states that the State may, upon timely notice to the defendant, amend the form or substance of an indictment. However, it has been held that amendments to a judicial

13

confession do not serve to amend the indictment. *Puente v. State*, 320 S.W.3d 352, 358 (Tex. Crim, App. 2010). There the Court referred to methods of amending the indictment, and found that interlineation of the indictment was one method, but also seemed to approve the process of filing an amended copy of the indictment as another means of showing the changes. However, amending the judicial confession was NOT approved. The case was reversed.

ANALYSIS

In the case at bar the judicial confession incorporates the changes that the State proffered. However, the indictment itself, as amended, does NOT have those changes. It still carries within it the dual dates of allegations.

It is axiomatic that the proof must comport with the allegations in an indictment. The State's burden is to prove each and every element alleged beyond a reasonable doubt. *See*, Due Course of the Law provision, TEX. CONST., art. 1, §19, and TEX. CODE CRIM. PROC., Art. 1.04; W*ilson v. State*, 536 S.W.2d 375, at 377 (Tex.Crim.App. 1976) ( state law). Federal argument rests in due process rights as guaranteed under U.S.CONST. amend. XIV; *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *In re Winship*, 397 U.S. 358 (1970). The Texas Constitution provision has been

held analogous to Fourteenth Amendment Due Process. *See, Webb v. State,* 278 S.W.2d 158, 160 (Tex. Crim.App. 1955). Under legal sufficiency, all the evidence is reviewed in the light most favorable to the jury's verdict to determine whether or not any rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Brooks v. State,* 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).

Here, the State's evidence fails because there is a difference in dates of the offense. In each of two of the three counts the State alleged two different dates. How can there be sufficient evidence on the date where NO proof is offered? That evidence simply does not exist. Each of those counts allege two different offenses. The third count alleges one of the two dates in the first count. So those counts are indistinguishable.

Count One alleges an offense on December 22, 2011, and also on January 21, 2012. There is NO evidence to support the first part of that Count I; therefore, the evidence is legally insufficient to convict.

Count Two alleges an offense on February 28, 2011, and on February 28, 2012. There is NO evidence to support the first part of that Count II; therefore, the evidence is legally insufficient to convict.

It might be argued that, even so, the evidence is present to convict on Count III, since there was no change in the date there. Moreover , it might be

contended that, absent an objection, there is nothing to review as to this issue. *See, Studer v. State*, 799 S.W.2d 263 (Tex. Crim. App. 1990); Art. 5, §12, TEX. CONST.; Art. 1.14(b), TEX. CODE CRIM. PROC.

However, Appellant would counter that he is not challenging sufficiency of the indictment, but **the proof** needed to make the prima facie case, the legally sufficiency of the evidence. The case at bar has embedded in it a violation of double jeopardy, since the offense in Count III is identical to Count I. It runs afoul of Sixth Amendment Double jeopardy interpreted by *Blockberger v. United States*, 284 U.S. 299 (1932). Is not the one offense the same as the other, without any variance in an element of the offense? This is condemned under double jeopardy: a person cannot be punished twice for the same offense. *See, Bigon v. State*, 252 S.W.3d 360, 364 (Tex. Crim. App. 2008). *See also*, TEX. CONST. Art. 1, §14 double jeopardy clause. Additionally, how could Appellant ever plead this conviction in bar? He could not. There is no way that Appellant could bar a subsequent prosecution for offenses under the dates alleged.

For those reasons, Appellant requests that this Court reverse the conviction, vacate the judgment and remand with orders for an acquittal, or, alternatively, a new trial.

**FOURTH ISSUE, RESTATED**

THE JUDGMENT IS VOID BECAUSE APPELLANT WAS NOT GIVEN CREDIT FOR TIME SPENT UNDER HOUSE ARREST

**FIFTH ISSUE, RESTATED**

THE JUDGMENT IS DEFECTIVE AND SHOULD BE REFORMED TO GIVE APPELLANT CREDIT FOR TIME SPENT UNDER HOUSE ARREST

**SIXTH ISSUE, RESTATED**

THE TRIAL COURT REVERSIBLY ERRED WHEN IT DID NOT GIVE APPELLANT CREDIT ON HIS SENTENCE FOR TIME HE SPENT UNDER HOUSE ARREST, WHICH WAS THE EQUIVALENT UNDER ART. 42.035, TEX. CODE CRIM. PROC., TO TIME SPENT INCARCERATED

In the interests of judicial economy, these issues are grouped together, since they have a common nexus of fact and law.

FACTS

Very early in the case, before even the indictment was issued,[2] Appellant was arrested and bond was set at a very high amount. Counsel was appointed on March 22, 2012 (CR 10), who brought an Application for Writ of Habeas Corpus on March 28, 2012 (Supp CR 6). At the hearing on the Writ on April 5, 2015, the trial court reduced the bond to $30,000 on each count and entered the following orders:

---

[2] Indictment issued April 26, 2012.

17

"Defendant to be placed on House Arrest with monitor, will be allowed to seek employment with notice to Probation Department and with permission [;] Defendant is to have no contact with victim."[3]

At the hearing on Appellant's Motion for New Trial witness Darren Williams (Harrison County community supervision officer) testified about the requirements of Appellant while on that house arrest: he was restricted to his home (MNT RR 15) and could only leave upon knowledge and permission from Williams (MNT RR 17); that Appellant wore an ankle monitor to indicate his whereabouts (MNT RR 14-15), which was checked daily (MNT RR 15); that Appellant was required to call Williams at certain times and to report monthly in person (MNT RR 16, 19); that Williams derived his authority to have control over Appellant from that order of the trial court (MNT RR 17, 20); that Appellant's remaining at home or leaving there was under Williams' control (MNT RR 19); that Appellant was detained at his house unless he got Williams' permission to leave and that Williams controlled Appellant's comings and goings (MNT 19-20); that the restrictions ceased when, on January 13, 2015, the trial court modified the terms of the bond and no longer required house arrest and an ankle monitor (MNT RR 20; MNT Exhibit #2). Appellant also signed a contract (the

---

[3] *See,* Appellant's MNT Exhibit #1; *also, see* Order attached to "Defendant's Motion to Modify Conditions of Bond" (CR 49-50).

"Harrison County CSCB Electronic Monitoring Program Agreement") shown in MNT Exhibit #3, according to testimony from Mr. Williams (MNT RR 17-18).

Appellant confirmed the testimony of Mr. Williams, relating how he wore the ankle monitor every day while under house arrest (MNT RR 21). His movements were restricted; the consequences of failing to wear the ankle monitor and failing to obey certain restrictions would have been arrest and incarceration (MNT RR 22).

The computation of the days during which Appellant was on house arrest and wore an ankle monitor amounts to two years and 299 days (*see* difference in days as shown on the bail bond [indicating a date of arrest as March 20, 2012, (see, CR 13, 15, 17)] and MNT Exhibit #2 date of January 13, 2015, as date of release from house arrest, or 66 days shy of one more year). Appellant's sentence was three years confinement to TDCJ (CR 144).

LAW AND ANALYSIS

Art. 42.035, TEX. CODE CRIM. PROC., establishes an equivalence between time on house arrest with an electronic monitor and time spent in jail. Under that statute, successful participation in such a program discharges a jail sentence the same as if the defendant had been incarcerated.

Aside from the obvious rationale that "the Legislature said it, so it must be the law," one may also advance the rationale that such a program of house arrest equates to confinement because of the liberty interest at stake. That liberty interest under Fourteenth Amendment Due Process of Law is what underlies some habeas proceedings where the issue of mandatory release is raised. *See, e.g., Ex parte Patterson*, 740 S.W.2d 766, 769 (Tex. Crim. App. 1987), overruled on other grounds, *Ex parte Beck*, 769 S.W.2d 525 (Tex. Crim. App. 1989). It also underlies, in a civil context, those cases where relief is considered for persons in civil contempt actions, where the liberty interest of the person held in contempt serves as grounds for review of the justness of the contempt order. *See, e.g. Ex parte Brister*, 801 S.W.2d 833, 835 (Tex. 1990) (person adjudged in contempt of court and ordered to be **placed on house arrest and have an electric monitor, just as in the case at bar;** Texas Supreme Court found a liberty interest at stake).

It is also important to indicate that, in Chapter 11. TEX. CODE CRIM. PROC., there are several statutes that are relevant to this discussion. Art. 11.21, TEX. CODE CRIM. PROC., offers definitions of such terms as "confined," "imprisoned," "in custody," confinement," and "imprisonment" as follows: such terms "refer not only to the actual corporeal and forcible detention of a person, but likewise to any coercive measures by threats,

menaces or fear of injury, whereby one person exercises a control over the person of another, and detains him within certain limits."

Then Art. 11.22, TEX. CODE CRIM. PROC., defines "restraint," saying: "By 'restraint' is meant the kind of control which one person exercises over another, not to confine him within certain limits, but to subject him to the general authority and power of the person claiming such right."

The restrictions placed upon Appellant and the power that Mr. Williams exercised over him all indicate that Appellant was restrained and under the control of Williams as defined in those statutes. His liberty had been impaired; he was to some measurable degree confined and in custody as those statutes contemplate. The statutes do not say that those definitions are restricted solely to analysis of habeas proceedings.

At the hearing on the Motion for New Trial the State relied upon *Tagorda v. State*, 977 S.W.2d 632 (Tex. App. – Fort Worth 1998, no pet.). The case is easily distinguished. Art. 42.03 Sec. 2(a), TEX. CODE CRIM. PROC., is not controlling because Art. 42.035, TEX. CODE CRIM. PROC., provides the express equivalence of house arrest on electronic monitoring to jail time. No ifs, ands, or buts. The law is clear; it is express; it is

unambiguous. The defendant in *Tagorda* made no such argument. The case is inapposite and not controlling.

Some insight into these issues is given in B. Feuchter, "CRIMINAL LAW – Home Alone: Why House Arrest Doesn't Qualify for Presentence Confinement Credit in New Mexico – *State v. Fellhauer,*" 28 New Mexico Law Rev. 519 (Summer 1998). The author surveyed many jurisdiction and boiled them down into three groups on the question of giving credit/not giving credit for presentence time served under house arrest: Group One consisted of Michigan, Arizona, Idaho, and Florida and the federal penal system, each of which has "an explicit correctional facility detention requirement set forth in its presentence confinement credit statute", 28 New Mexico Law Rev. at 522. He cites to those statutes and some case law precedents. 28 New Mexico Law Rev. at 522-23.

In Group Two are six states: New Jersey, Maryland, Wyoming, Vermont, Nevada, and Alaska. According to the author, "[t]these states focus more on the restrictions of a prisoner's liberty than the place of confinement for granting presentence confinement credit. 28 New Mexico Law Rev. at 523. With one exception[4], there seems to be no statutory basis

---

[4] New Jersey enacted its "New Jersey's Comprehensive Drug Reform Act of 1986," codifying the concept that a person in a residential drug treatment program was

for the orientations of those states; instead, the author cited to case law precedents that recognize that under certain conditions. *See, e.g. Dedo v. State*, 680 A.2d 464 (Md. Ct. App. 1996), where credit was granted to a defendant who was placed under house arrest under the custody of a warden of a county detention center, and subject to an escape charge for violation of the terms of his house arrest; the court found that the defendant was in the constructive custody of the state and therefore entitled to presentence confinement credit. Appellate courts in the other jurisdictions followed the same or similar reasoning in the following cases: *State v. Reyes*, 504 A.2d 43 (N.J. Super. Ct. App. Div.), *cert. denied*, 511 A.2d 671 (1986); *Yellowbear v. State*, 874 P.2d 241 (Wyo. 1994); *In re McPhee*, 442 A.2d 1285 (Vt. 1982); *Grant v. State*, 659 P.2d 878 (Nev. 1983); *Nygren v. State*, 658 P.2d 141 (Alaska Ct. App. 1983).

Group Three were three states, California, Illinois, and Wisconsin, that "do not explicitly require detention in a prison facility to grant presentence confinement credit, but do recognize house arrest as official confinement" 28 NEW MEXICO LAW REV. at 524 and cases cited there.

<hr>

entitled to presentence confinement credit. 28 NEW MEXICO LAW REV. at 523, n. 46. *State v. Fellhauer*, 943 P.2d 123 (Ct. App.), *cert. denied*, 942 P.2d 189 (1997).

Texas expressly has a statute that recognizes house arrest as equivalent to jail confinement in Art. 42.035, TEX. CODE CRIM. PROC.

Moreover, under the rationale found in the *Dedo* decision and those other cases in Group Two, supra, Appellant was under the control of an agent of the state who constantly monitored and approved (or disapproved) where he went and what he did. Appellant, like those defendants, was faced with incarceration if he failed to measure up to the conditions of his house arrest. He was "confined" and "restrained" as those terms are defined.

Another way to analyze the problem is by applying an axiom of Euclidean geometry, called the First Element: "Things which are equal to the same thing are equal to each other."[5] Stated symbolically, that can be expressed: If A = B and if A = C, then B = C.

Art. 42.035, TEX. CODE CRIM. PROC. equates house arrest (A) and jail time (B). Successful completion of the one equates to successful completion of the other.

Therefore, A = B. One can absolve oneself of time on a sentence by house arrest. House arrest and incarcerated time served in the county jail are equivalent.

---

[5] See, "Euclid's Elements, Book I, Common Notions" found at aleph0.clark.edu/~djoyce/elements/bookl/cn.html

In the case at bar:

"C" is Mr. Jones' house arrest for 1,097 days; that is, 68 days short of three calendar years. The quality of that period of time for Appellant was no different that what is contemplated in Art. 42.035, TEX. CODE CRIM. PROC. He wore an ankle monitor; his goings and coming were regulated by Mr. Williams and were subject to Williams' approval or disapproval. His liberty was restricted. The statute chisels into law the equivalence of that sort of restriction of one's liberty with time in the county jail.

Therefore, A = C. They are equivalent. There is no difference between the house arrest contemplated in the statute and the terms and conditions that were placed upon Appellant.

So, if A = B, and if A = C, then B = C. The time served under house arrest is equivalent to time served on Appellant's sentence in the case at bar.

Another way to argue this concept is to consider that, in almost every case one can conceive, when a defendant is in the county jail awaiting the outcome of his case (that is, bond has been set but he cannot make bond *and be at liberty*[6] while awaiting trial), he or she is given credit for time in county jail on the sentence. *See*, Art. 42.03, Sec. 2(a)(a), TEX. CODE CRIM. PROC. So, for example, a person sits in the county jail for 100 days

---

[6] There's that concept of LIBERTY again.

awaiting a trial for felony theft and then gets sentenced to 10 years TDCJ, the court's judgment will recite a credit of 100 days on that sentence. It happens all the time. One is no less incarcerated because one is in a county jail versus a unit of the prison system. Correct? Time incarcerated equals time incarcerated, right? If Mr. Ich Bin Dieb spends a day in Bowie County jail and then gets sent off the Huntsville, that is one day less he must serve on a felony sentence in TDCJ, regardless of what unit he is sent to -- however "max" or minimum it might be, however harsh or lenient its conditions. Time is time.

So how can one argue, then, that the legislature meant something different here? The statute equates time of incarceration to time on an ankle monitored house arrest. There it is. The statute does not say, "King's X. We do not intend to allow this to be used in a situation where someone is headed to a unit of TDCJ." That is not stated in the law. It says that house arrest and jail time are equivalent. If credit for jail time served is allowed as credit for time served on a felony sentence, then one is compelled to admit that there is no difference in allowing credit for time on an electric monitored house arrest. And why? Because the legislature has recognized that each constitutes a deprivation of one's liberty interest, a denial of freedom.

26

On review, the Court should find the judgment void and remand with an order to correct the judgment to reflect time served to include the period on house arrest, or, alternatively, the Court should correct and reform the judgment to recognize that credit of time against the sentence.

**SEVENTH ISSUE, RESTATED**

THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO
SUPPRESS APPELLANT'S STATEMENT

FACTS

On August 27, 2014, the trial court convened to hear Appellant's "Motion for Hearing on Voluntariness of Any Statement, Admission or Confession, Whether Written or Oral" (RR III, CR 31). In the second paragraph of the Motion, Appellant invoked the protections of the Fifth, Sixth, and Fourteenth Amendments, U.S. CONST., and Art. 1, §10, TEX. CONST., and Articles 38.21, 38.22, and 38.23, TEX. CODE CRIM. PROC.

The State called as its witness Cindy Black, an investigator with the Harrison County Sheriff's Office, who testified that she mostly investigated cases of sexual assault (III RR 6). She investigated Appellant's case, and she identified him in open court (III RR 7). State's exhibit #1 was admitted as the document signed by appellant at the start of the interview, setting out his Miranda rights/warnings (III RR 8-9). Appellant was not at that time under arrest (III RR 9-10).

27

State's exhibit #2 was also introduced: a copy of the video interview of Appellant (III RR 10-11). It was then published (III RR 11) and played for the trial court; the entire interview was 47 minutes long (III RR 12).

Counsel for appellant informed the trial court that the portion to which he objected began at about the 10, 11, 12 minutes into the interview, and that anything beyond that was inadmissible (III RR 12-13).

Counsel for the State contended that the material had to placed into context, that "the Court can't just look at that one little snippet. It needs to at least get an idea of all of the circumstances of the interview. I was going to play the first 20 minutes…" (III RR 13).

The witness was questioned further as the video was played, stating that Captain Latham came into the room at one point, and that Investigator Jeff McAndrews and she were the only ones in the room (III RR 13-14).

Detective Black then testified that he (Captain Latham) closed the door and "said that Heather was being honest" (III RR 14).[7] Thereafter, Appellant was interviewed for about one-half hour, and confessed to having sex with the underage victim with his wife present, that he confessed multiple instances of sex with the minor, that he confessed to having oral sex with her, and that following that interview he was arrested (III RR 14-15).

---

[7] The reference is to Heather Jones, appellant's wife, who was being separately interviewed by other members of law enforcement.

On cross-examination the witness stated that Deputy McAndrews stepped out into the hallway and talked to Captain Latham there (III RR 15). Then there was this:

Q:    And you heard Deputy McAndrews come back in and as soon as – right after he talked to Captain Latham, tell my client that his wife is giving a statement and she's being honest about everything?

A:    Uh-huh, yes sir.

Q:    And everything – I believe he said, "Honest about everything that went on," I believe. Anyway, I don't know the – we can watch the video, but it's not necessary.

But we know he says she's being honest about everything, correct?

A:    I know he said she was being honest. I don't know if he said "about everything," but he said she's – she's being honest.

Q:    Okay, And that would be in the context of giving a statement, correct?

A:    Yes.

Q:    And he was encouraging him to give a statement and be, quote, honest?

A:    Yes.

Q:    And being as detailed and honest as she was in her statement?

A:    Yes.

(III RR 16-17)

The witness then stated that, at the time she was interviewing Appellant, Lieutenant Duncan was interviewing Heather Jones in another room. However, she herself did not know that at the time (III RR 17). Detective Black then testified that she was under the impression that there was an interview still going on with Heather at that time, and that she was being open and honest and telling everything (III RR 19). That created in her mind the impression that the other officers were getting "a good interview" from Heather Jones with a lot of details; so she pressed Appellant to corroborate those details (III RR 20).

Detective Black testified that it would be reasonable for Appellant to assume that his wife was giving a detailed, honest, interview and statement to law enforcement (III RR 21-22).

Then there was this exchange:

Q:     …I was characterizing Deputy McAndrews' statement as to what was going on in the interview with Heather Jones as not being – as being a false statement as to what was really happening down there which, of course, nothing was happening because she made no statement, correct?

A:     Correct.

Q:     So she's – she's not being – she's not providing a lot of details. She's not being completely honest from the police officer's perspective. As you say, she lawyered up?

A:     Yes.

(III RR 23)

The witness confirmed that, immediately after Deputy McAndrews made that statement upon coming back into the interview room, Appellant began (in the words of Det. Black) "to tell the truth" , although the witness agreed that it would be up to the jury to make the determination of whether what he said was true or not (III RR 25).

After the State rested, trial counsel for Appellant called Captain Marty Latham to testify (III RR 28). He stated that he had participated in interviewing Heather Jones and also Appellant in March 2012 (III RR 29). The video of Heather Jones was then offered by Appellant (III RR 29-30). It was marked at defendant's Exhibit No. "H" for the hearing, played, and admitted into evidence (III RR 31). Capt. Latham confirmed that after a time he left the interview room where Heather Jones was being questioned and went to the room where Appellant was being interviewed, knocked on the door, and asked Investigator McAndrews to step out (III RR 34). He did not "recall exactly" what he told him (III RR 35). He did tell McAndrews

31

that when he went back in to talk to Appellant to "just tell him to be honest, and I wanted him to think she's being honest with us, too." (*id*.)

For the limited purposes of the hearing, Appellant took the witness stand (III RR 37). Appellant related how, at about 10 to 10:30 minutes into the interview, there was knock at the door, that the other detective stepped out, spoke a moment, came back in and explained that "my wife was giving a statement of which she was being honest, at least that's how I took it, that she was giving some sort of statement and giving details towards the case," though those were not his exact words.[8] The statement by the officer created in Appellant's mind the impression that his wife was giving a detailed statement interview down the hall (III RR 39). Appellant further stated that, had it not been for the statement made by Detective McAndrews, he would not have made other statements (III RR 41). He regarded that statement as false (III RR 42), and based upon it he changed his entire statement, relying upon McAndrews statement as being true (III RR 43). As a result of that, he testified that he had been harmed: arrested, lost work (id.) , lost his home and caused issues with his schooling because of financial problems arising from his having to pay for the ankle monitor (III RR 44). Appellant on cross-

---

[8] See State's Exhibit #1 at about 10:30 where the door opens and man exits, then about 10:50 it opens again and man comes back in, and man's voice can be heard at about 10:55 saying that the wife is being completely honest about it, that Appellant needs to begin to be completely honest.

examination testified that he began to tell make his statement in order to protect his wife and to keep her from going to jail (III RR 52).

The trial court denied the Motion (III RR 53).

LAW

When reviewing a trial court's ruling on a motion to suppress, the reviewing court views the evidence in the light most favorable to the trial court's ruling. *State v. Robinson*, 334 S.W.3d 776 (Tex. Crim. App. 2011); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). If the trial court makes findings of fact, the court determines whether the evidence supports those findings. *Id.* It then reviews the trial court's legal rulings *de novo* unless the findings are dispositive. *Id.*

A defendant who moves for suppression under Article 38.23, TEX. CODE CRIM. PROC., due to the violation of a statute has the burden of producing evidence of a statutory violation. *State v. Robinson*, 334 S.W.3d at 779; *Pham v. State*, 175 S.W.3d 767, 772 (Tex. Crim. App. 2005). Only when this burden is met does the State bear a burden to prove compliance. *Id.*

Further, a defendant must show a causal connection between a statutory violation and the obtaining of evidence before the evidence is rendered inadmissible. *Pham*, 175 S.W.3d at 772-773. If the defendant

33

produces evidence that there is a causal connection, the State may either try to disprove this causal evidence, i.e. disproving that there is a causal connection in existence at all, or, the State may make an attenuation-of-taint argument. Evidence is not obtained in violation of a provision of law if there is no causal connection between the illegal conduct and the acquisition of the evidence. *Gonzales v. State,* 67 S.W.3d 910, 912 (Tex. Crim. App. 2002). Thus, the evidence would not be excluded pursuant to article 38.23, TEX. CODE CRIM. PROC.

Under Art. 2.12, TEX. CODE CRIM. PROC., a deputy sheriff is a peace officer. Under Art. 2.13, TEX. CODE CRIM. PROC., "[i]t is the duty of every peace officer to preserve the peace within the officer's jurisdiction. To effect this purpose, the officer shall use all lawful means." Moreover, under Art. 2.13(b)(a), TEX. CODE CRIM. PROC., the officer shall "…prevent or suppress crime." Each peace officer, whether elected or appointed, takes and swears to the oath of office found in Art. 16, §1(a), TEX. CONST., which states, in relevant part, that the officer "will...preserve, protect, and defend the Constitution and laws of the United States and of this State…" Our courts have held that "[p]eace officers have a duty to prevent crime and arrest offenders." *See, City of Dallas v. Half Price Books, Records, Magazines, Inc.*, 883 S.W.2d 374, 377 (Tex. App. – Dallas

1994, no writ); cited with approval in *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 800 (Tex. 2006)(Brister, J., concurring).

FRAUD AND RELATED CONCEPTS

RESTATEMENT OF CONTRACTS (SECOND) has several provisions on fraud:

§ 159. Misrepresentation Defined

A misrepresentation is an assertion that is not in accord with the facts.

§ 162. When A Misrepresentation Is Fraudulent Or Material

(1) A misrepresentation is fraudulent if the maker intends his assertion to induce a party to manifest his assent and the maker
(a) knows or believes that the assertion is not in accord with the facts, or
(b) does not have the confidence that he states or implies in the truth of the assertion, or
(c) knows that he does not have the basis that he states or implies for the assertion.
(2) A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so.

§ 164. When A Misrepresentation Makes A Contract Voidable

(1) If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.
(2) If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction.

## § 167. When A Misrepresentation Is An Inducing Cause

A misrepresentation induces a party's manifestation of assent if it substantially contributes to his decision to manifest his assent.

**Texas Penal Code**

Chapter 32, TEX. PENAL CODE, codifies many sorts of fraudulent practices as crimes. One of those is found in TEX. PENAL CODE §32.42, Deceptive Business Practices, stating, in relevant part, that a "person commits an offense if in the course of business he intentionally, knowingly, recklessly, or with criminal negligence commits one or more of the following deceptive business practices:" There follows a "laundry list" of deceptive business practices, included that found in §32.42 (b) (12), which is: "making a materially false or misleading statement…(B) otherwise in connection with the purchase or sale of property or service."

The statute also defines in §32.42 (a)(2), that " 'business' " includes trade or commerce and advertising, selling, and buying service or property."

**Texas Business & Commerce Code**

Chapter 17 of the Texas Business & Commerce Code sets out several types of deceptive trade practices. TEX. BUS. & COMM. CODE, §17.01 *et. seq.,* all of which have as a component a knowing misrepresentation of something for what it is not. Similarly, Chapter 27 of the Texas Business & Commerce Code sets out several other types of fraud. TEX. BUS. &

COMM. CODE, §27.01, concerns fraud in real estate and stock transactions. TEX. BUS. & COMM. CODE, §27.02, concerns fraud in certain insurance claims. Again, a knowing misrepresentation is part of the condemned conduct, for which liability may attach.

ANALYSIS

At the hearing on the Motion to Suppress Appellant contended that law enforcement had engaged in fraud to obtain Appellant's statement. Trial counsel argued to the court that there is a law "pertaining to fraud and fraudulent representations…that McAndrews' statement is a fraudulent statement that [Appellant] relied upon; and, as a result of it, he changed his position and acted in a way that he wouldn't have absent the statement, and has been harmed by it; therefore, it is fraud." (III RR 50-51).

That argument relies upon the common law definitions of fraud found in the RESTATEMENT OF CONTRACTS (SECOND) cited, *supra*. There were misrepresentations; those misrepresentations were material; there was detrimental reliance; the State gained a distinct advantage over Appellant, namely, evidence (incriminating admission by a party opponent) that it relied upon to prove its case.

Moreover, the agents of the State are the designated "peace officers" who, by statute, are the keepers of the peace in the state of Texas, charged

by law with preventing crime. The statements of McAndrews were false and made with the intent to get Appellant to accept its truth and make a confession; it had that desired effect. The officer was a public servant who was in the business of offering the services of those who "protect and serve," who had taken an oath under the Texas Constitution to "faithfully execute the duties of a deputy sheriff and to preserve, protect, and defend the Constitution and laws of the United States and of this State." *See*, Art. 16, §1(a), TEX. CONST. If McAndrews, and others like him, who provide those services, are not engaged in the service of providing law enforcement paid for by the taxpayers of the State, then who is?

It might be argued that under several recognized precedents the courts permit a degree of deception when it comes to the investigation of crime. *See, e.g., Frazier v. Cupp*, 394 U.S. 731 (1969); *Moran v. Burdine*, 475 U.S. 412 (1986). However, that is not without its limits, and some deception is clearly not countenanced by the courts. *See, Lynumn v. Illinois*, 372 U.S. 528 (1963), drawing the clear distinction that, deception predicated upon coercion involving the security of family members and the family relationship, violates Fourteenth Amendment Due Process.

At least one court has held that the distinction in allowing or disallowing a confession induced by deception is a distinction between an

"intrinsic" deception as opposed to an "extrinsic" deception; that the former is not at as likely to lead to a false confession as the latter. *See, State v. Kelekolio*, 849 P.2d 58 (Hawaii 1993).

It is readily apparent in the case at bar that the facts more resemble *Lynumn* and the use of "extrinsic" deception: the officer represented that Appellant's spouse was being "completely honest", thereby triggering Appellant's insecurity about his wife's well-being and concerns about her being prosecuted and sent to jail, all matters that were extrinsic to the facts at hand. For those Fourteenth Amendment Due Process considerations the statement should have been suppressed.

Moreover, when one turns to Art. 32.23, TEX. CODE CRIM. PROC., there is the statutory prohibition against the admissibility and use of a confession that has been obtained in violation of the state and federal Constitutions and laws. *See, Pierce v. State*, 32 S.W.3d 247, 253 (Tex. Crim. App. 2000; *Wilson v. State*, 311 S.W.3d 452 (Tex. Crim. App. 2010).

Appellant contends that in multiple ways the State's interrogating officers used misrepresentations that violated the law and the state and federal constitutions. First: there were misrepresentations that were material and upon which Appellant relied to his detriment. That is a violation of the common law of fraud, embodied in the sections of the RESTATEMENT OF

CONTRACTS (SECOND) *supra*.[9] Next, it violated TEXAS PENAL CODE, §32.42(b)(12)(B), in that the officer made the misrepresentation in connection with the services he was offering. Moreover, the misrepresentations were in violation of U.S. Constitutional Fourteenth Amendment Due Process, as interpreted in the *Lynumn* decision. Consequently, in one of three ways, or two of three, or all three, there was a violation of the law in the procuring of the confession. Those misrepresentations vitiate the confession. It was reversible error not to suppress the statement and reversible error to admit it into evidence.

HARM ANALYSIS

Harm analysis proceeds under Rule 44.2(a), TEX. R. APP. PROC., since it involves Fifth and Fourteenth Amendment constitutional errors. It cannot be said beyond a reasonable doubt that the error did not contribute to the conviction or punishment in the case, since, after the trial court overruled the motion to suppress, instead of proceeding to trial on guilt-innocence, Appellant pleaded guilty. Also, the trial court relied upon the confession in

_____

[9] *See, In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 758 (Tex. 2001); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998). *See also, Taylor Elec. Servs., Inc. v. Armstrong Elec. Supply Co.,* 167 S.W.3d 522, 526 (Tex. App.-Fort Worth 2005, no pet.) (citing *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex. 1990)); *see, Grant Thornton LLP v. Prospect High Income Fund,* 314 S.W.3d 913, 921 (Tex. 2010).

finding Appellant guilty and in assessing punishment. *See,* VIII RR 5, lines 17-23. *See, Holmes v. State*, 323 S.W.3d 163, 173-74 (Tex. Crim. App. 2010). Therefore, the error was harmful. The conviction and sentence should be reversed and remanded for a new trial.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, CASEY AUSTIN JONES, APPELLANT, prays that this Honorable Court of Appeals, upon review of the record and consideration of the issues set forth, and the argument and authorities presented, will find error and reverse and remand this cause for a new trial on guilt and innocence and/or on punishment, or, alternatively, reform the judgment to allow credit on his sentence for time spent under house arrest, and for such other and further relief to which Appellant may be entitled at law and equity.

Respectfully submitted,

__/S/ Hough-Lewis Dunn
Hough-Lewis ("Lew") Dunn
Attorney at Law
P.O. Box 2226
Longview, TX 75606
E-mail: dunn@texramp.net
Vox: 903-757-6711
Fax:  903-757-6712
Counsel for Appellant
Casey Austin Jones

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing "Brief for Appellant" has been sent by electronic transmission to the following on this 21st day of December, 2015:

Hon. Laura M. Carpenter, Assistant Criminal District Attorney, Harrison County, Texas, at her e-mail address: laurac@co.harrsion.tx.us.

__/S/ Hough-Lewis Dunn
Hough-Lewis ("Lew") Dunn

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with Rule 9, TEX. R. APP. PROC., regarding length of documents, in that exclusive of caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix, it consists of 9,151 words.

/s/ Hough-Lewis ("Lew") Dunn
Hough-Lewis ("Lew") Dunn